UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SONIA M. EVANS,
o/b/o DCB,

             Plaintiff,                    Civil Action No. 11-cv-11862

         v.                       District Judge Denise Page Hood
                                 Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15,18]**

      Plaintiff Sonia M. Evans brings this action pursuant to 42 U.S.C. § 405(g) on behalf of her minor child, DCB, challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions, (Dkts. 15, 18) which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), (Dkt. 3).

**I. RECOMMENDATION**

      For the reasons set forth below, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

Plaintiff applied for SSI on behalf of DCB on March 8, 2007 asserting a disability onset date of February 22, 2007. (Tr. 179.) The Commissioner denied DCB's disability application on June 6, 2007. (Tr. 59.) Plaintiff then filed a request for a hearing, and on May 28, 2009, appeared with counsel and DCB before Administrative Law Judge ("ALJ") Henry Perez, Jr., who considered the case *de novo*. (Tr. 32-57.) In a January 28, 2010 decision, the ALJ found that DCB was not disabled. (Tr. 6-23.) The ALJ's decision became the final decision of the Commissioner on February 25, 2011 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on behalf of DCB on April 27, 2011.

### B. Background

Plaintiff's child, DCB, suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), Oppositional Defiant Disorder ("ODD") and a learning disability. (Tr. 12.) He was 10 years old when he appeared for his hearing before the ALJ. (*Id*.)

#### 1. The May 28, 2009 Hearing Before the ALJ

##### a. DCB's Testimony

DCB's testimony consisted of interrupting his mother's testimony and a very brief interaction with the ALJ. (Tr. 34-57.) He called his mother a "crybaby" repeatedly. (Tr. 36, 37.) In addition, at one point he testified that he was "talking to [his] imaginary friend." (Tr. 39.) Overall, DCB was very disruptive. (Tr. 41.)

### b. Plaintiff's Testimony

Plaintiff stated that DCB's "difficulties" began when he was in pre-school. (Tr. 36.) She testified that DCB had been kicked out of school twice for fighting and "cussing, and hollering and screaming at the teachers." (*Id.*) At the time of the hearing, DCB was in a class for students with emotional impairments – an "EI" class. (*Id.*) He also received treatment from the St. John Eastwood Clinic in Detroit, Michigan ("Eastwood Clinic"). (Tr. 37.) Plaintiff testified that DCB played with other neighborhood children but always ended up fighting. (Tr. 38.) She also testified that he attended special education classes for the last three years. (Tr. 39.) She stated that DCB is aggressive with other students, teachers and herself. (Tr. 40.) She stated that some of DCB's medications actually increased his aggressiveness. (*Id.*) At the time of the hearing, DCB was in fourth grade, but Plaintiff claimed his academic work was "still at a kindergarten, first grade level." (Tr. 41.) Plaintiff stated that DCB had a "learning disability." (Tr. 43.) She also stated that he does not pay attention when spoken to; he does not do housework; he does not do homework; he gets frustrated easily; and he is impatient. (Tr. 43-48.) Plaintiff indicated that DCB had cuts and bruises that were partially self-inflicted. (Tr. 53.) Plaintiff could not recall what medication DCB was taking at the time of the hearing. (*Id.*)

### 2. Medical Evidence

DCB received treatment from Therapist Carleen Verbeke and Psychiatrist Barbara Wailes at the Eastwood Clinic from December of 2006 through April of 2007. (Tr. 87, 129-38.)

On December 28, 2006, Therapist Verbeke completed an Intake Assessment Form for DCB. (Tr. 136-38.) Verbeke indicated that DCB's mother wanted to address DCB's behavior so that he could stay in school, decrease suspension, and reduce hyperactivity. (Tr. 136.) DCB's mother

3

indicated that DCB was hyperactive both at home and school. (*Id.*) She also said he was defiant and acted before thinking. (*Id.*) She stated that he had been hyperactive since he was a toddler; he walked at eight months. (*Id.*) Verbeke indicated that DCB's appearance at Intake was appropriate, but his rapport was poor, and his mood guarded. (*Id.*) Verbeke also noted that DCB had a current and/or previous history of impulsive behavior and/or poor judgment. (Tr. 137.) Indeed, Verbeke wrote that DCB's "behavior is extremely hyper in all settings. He throws temper tantrums, argues with adults, refuses to comply with reasonable adult requests, is easily annoyed by others (abusive at intake) and is often angry." (*Id.*) She diagnosed him with ODD and ADHD. (*Id.*)

On January 31, 2007, Psychiatrist Wailes prescribed Concentra, 18 mg for DCB and parenting skills classes for Plaintiff. (Tr. 135.)

On February 14, 2007, Dr. Wailes changed DCB's medication to Ritalin, and continued to recommend parenting skills classes for Plaintiff. (Tr. 133.)

On March 7, 2007, Psychiatrist Wailes changed DCB's medication to Adderall due to increasing aggression and tantrums on Ritalin. (Tr. 134.)

On March 9, 2007, Dr. Wailes continued Adderall 10 mg, and again suggested that Plaintiff needed to "improve parenting skills." (Tr. 132.)

On April 4, 2007, Therapist Verbeke indicated that Plaintiff's hyperactivity and fighting at school had decreased as a result of being on Adderall. (Tr. 129.) She also indicated that his completion of school-related tasks had increased. (*Id.*) However, she noted that DCB had "significant disturbance . . . in patterns of sleep" possibly due to medication. (Tr. 129-30.)

On April 11, 2007, DCB had a medication review, and Dr. Wailes continued him on

Adderall. (Tr. 131) At that time, she also gave DCB a GAF of 58-60.[1] (*Id.*) Eastwood Clinic discharged DCB on July 25, 2007 because he had two "no shows" for therapy appointments and one "no show" for a medication review. (Tr. 206.)

The record indicates that DCB did not return to Eastwood Clinic until October 5, 2007. (Tr. 200.) On that day, DCB went through another intake assessment. (Tr. 200-02.) Under client/parent expectations, an Eastwood therapist[2] wrote: "[Client's] mom would like [client] to calm down and focus better in school; behavior to improve. [Client] would like to change his behavior and would like to see his brother more often." (Tr. 200.) The therapist also indicated: "Mom suspects [Client] is not taking medication daily." (Tr. 200.) The therapist also noted that DCB's impulse control was poor, and diagnosed him with ADHD and ODD. (Tr. 200-202.)

DCB had a psychiatric assessment on November 7, 2007. (Tr. 203-205.) The Eastwood psychiatrist[3] noted that DCB's attention/concentration were poor, and insight and judgment limited. (Tr. 204.) The psychiatrist recommended Adderall 10 mg and behavior modification treatment. (Tr. 205.)

On a January 5, 2008 Treatment Plan Review Form, the therapist indicated some improvement in DCB's behavior. (Tr. 195.)

---

[1] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 30 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

[2] The therapist's name is illegible. (Tr. 200.)

[3] The psychiatrist's name is illegible. (Tr. 204.)

5

DCB had medication reviews on January 23, 2008, February 26, 2008, and March 26, 2008. (Tr. 197-99.)  The notes from the reviews are largely illegible.  (*Id*.)

On an April 5, 2008 Treatment Plan Review Form, the therapist indicated that DCB's grades and conflict resolution skills were improving.  (Tr. 191-92.)

DCB had a medication review on May 21, 2008.  (Tr. 196.)  The notes from this review are also largely illegible.  (*Id*.)  DCB had another medication review on June 16, 2008.  (Tr. 194.)  The psychiatrist noted that DCB's grades were improving, and recommended continuing therapy and medications.  (*Id*.)

On a July 5, 2008 Treatment Plan Review Form, the therapist indicated that DCB's academics had improved and he "passed to the next grade."  (Tr. 189.)  However, the therapist indicated that he was still getting into fights.  (Tr. 189.)  There is a gap in the record from July 5, 2008 to October 5, 2008.

On an October 5, 2008 Treatment Plan Review Form, the therapist indicated that DCB was doing better at school behaviorally and academically, but was still having trouble at home.  (Tr. 187.) The therapist also indicated that DCB had "impulsive behavior" and "tantrums."  (Tr. 188.) There is another gap in the record from October 5, 2008 to January 5, 2009.

On a January 5, 2009 Treatment Plan Review Form, the therapist indicated that DCB's tantrums during treatment sessions had improved, but he continued to have a problem at home.[4]  (Tr. 185-86.)

On an April 5, 2009 Treatment Plan Review Form, the therapist indicated that DCB got into a fight, and had "some impulse problems – touching other students inappropriately."  (*Id*.)  The

---

[4] The Court is unsure what sessions the therapist refers to in this form.

6

therapist also indicated that DCB was at risk for further impulsive behavior.  (Tr. 184.)

DCB had another Psychiatric Evaluation on July 11, 2009.  (Tr. 223-26.)  The therapist noted a history of insubordinate and disruptive behavior.  (Tr. 224.)  The psychiatrist diagnosed him with ADHD, ODD, and impulse control disorder.  (Tr. 226.)

DCB had a medication review on July 15, 2009.  (Tr. 222.)  The psychiatrist indicated that he was accompanied by his father, but his mother was present via telephone.  (*Id*.)  The medical notes state that DCB was defiant towards his mother and "indifferent when his behavior was discussed." (*Id*.)

On March 4, 2010, DCB went to the Detroit Children's Hospital Emergency Room for suicidal and violent behavior.[5]  (Tr. 230-35.)  The ER doctor, Dr. Haddad, noted the following:

> [DCB is] here with complaints of banging his head against the wall, verbalizing that he wants to kill himself, has assaulted other students in the school, and kept throwing himself against the wall and on the floor requiring multiple people to restrain him.  Mom states that he has had a history of ADHD and has been verbalizing lately that he wants to hurt himself and also today verbalized that he wants to kill mom.

(Tr. 230.)

At the time, DCB reported being on Catapres, Ritalin and Concentra.  (Tr. 231.)  The ER doctor prescribed a "psych social work evaluation and a urine drug screen."  (*Id*.)  The hospital's psychiatric social worker examined DCB, and diagnosed him with "mood disorder." (Tr. 233.)  She discharged him with instructions to "follow up at St. Johns Outpatient Psychiatry Clinic." (Tr. 233.)

---

[5] This evidence was not before the ALJ, but was considered by the Appeals Council.  (Tr. 4, 229.)

7

### 3. School Reports and Evaluations

On March 11, 2008, when DCB was in the third grade, Plaintiff received an Individualized Education Program ("IEP") Team Report. (Tr. 158-62.) The IEP indicates that DCB received instruction in both a general education and special education classroom. (Tr. 160.) It also indicates that he received accommodations in taking the MEAP, and extended time in the classroom on all subjects. (Tr. 161.) The IEP was updated and reviewed on March 4, 2009. (Tr. 171-79.)

### 4. Disability Forms Completed For Social Security Benefits

On a February 22, 2007, Disability Report, Plaintiff indicated that DCB, then seven years old, suffered from asthma, hyperactive disorder and aggressive behavior. (Tr. 86.) However, on an "Asthma Form," Plaintiff indicated that DCB never visited a hospital or doctor's office due to an asthma attack. (Tr. 92.) Plaintiff also indicated that DCB did not receive steroid or breathing treatments for his asthma. (Tr. 93.)

On the same form, Plaintiff listed the following daily activities for DCB: preparing foods such as sandwiches, planning and preparing meals, and household chores such as dusting and sweeping. (Tr. 96.) She also indicated that he sometimes set the table, mowed the lawn, and shoveled the snow. (*Id.*)

On May 11, 2007, Dr. Atul C. Shah examined DCB on behalf of the State Disability Determination Service (DDS). (Tr. 140-42.) DCB was eight years old at the time. (*Id.*) DCB was accompanied by his father and a babysitter due to the fact that his mother was hospitalized for kidney problems. (Tr. 140.) Dr. Shah noted that DCB was "getting F's in all the subjects in the past but . . . his grades have improved after he started the medications, Ritalin." (Tr. 140.) Dr. Shuh noted that psychomotor activity was increased, but that he was quiet during the evaluation with the

exception of "touching different items." (Tr. 141.)  DCB was "able to recite the alphabet correctly

on the third try."   (*Id.*)  Dr. Shuh diagnosed DCB with ADHD "with improvement with

medications."  (Tr. 142.)  He indicated that his prognosis was "good."  (*Id.*)

On May 30, 2007, Dr. Zahra Khademian completed a Childhood Disability Evaluation Form.

(Tr. 152-53.)  Dr. Khademian listed DCB's impairments as ADHD/ODD, Improved, and Asthma.

(Tr. 152.)  There is no indication that Dr. Khademian examined DCB.  (Tr. 152-57.)   Dr.

Khademian indicated that DCB's impairments did not meet, medically equal, or functionally equal

the applicable Listings.  (Tr. 152.)  Dr. Khademian evaluated DCB as having less than marked

impairments in acquiring and using information, attending and completing tasks, interacting and

relating with others,  and caring for himself.  (Tr. 154-55.)  Dr. Khademian indicated that DCB had

been very hyperactive for the last 3-4 years, and was impulsive.  (Tr. 157.)

In June of 2007, one of DCB's teachers, Mr. William David, completed a Teacher

Questionnaire for the Social Security Administration.  (Tr. 144-151.)  At the time, DCB was in the

second grade.  (Tr. 144.)  Mr. David indicated that DCB was not able to read or write.  (*Id.*)  He

performed math at the first grade level.  (*Id.*)  With regard to acquiring and using information, Mr.

David indicated that DCB had a "very serious problem" reading and comprehending written

material.  (Tr. 145.)  He also indicated that he had a "serious problem" expressing ideas in written

form.  (*Id.*)  He also wrote that DCB "cannot work independently.  He requires a lot of one on one."

(*Id.*)  With regard to attending and completing tasks, Mr. David indicated that DCB had a "very

serious problem" with focusing long enough to finish an assigned activity or task and carrying out

multi-step instructions.  (Tr. 146.)  He indicated that DCB had a "serious problem" completing work

accurately without careless mistakes, working without distracting self or others, and working at a

reasonable pace/finishing on time.  (*Id*.)  With regard to interacting and relating to others, Mr. David indicated that DCB had a "very serious problem" expressing anger appropriately.  (Tr. 147.)  He had "serious problems" with the following activities: 1) Playing cooperatively with other children; 2) Making and keeping friends; 3) Seeking attention appropriately; 4) Following rules; 5) Respecting/obeying adults in authority; 6) Using language appropriate to the situation and listener; 7) Taking turns in conversation; 8) Interpreting body language; and 9) Using adequate vocabulary. (*Id*.)  Mr. David also indicated that DCB had a "serious problem" moving his body from one place to another.  (Tr. 148.)  With regard to caring for himself, Mr. David indicated that DCB had a "serious problem" with the following activities: 1) Handling frustration appropriately; 2) Using good judgment regarding personal safety and dangerous circumstances; 3) Identifying and appropriately asserting emotional needs; and 4) Responding appropriately to changes in own mood.  (Tr. 149.)  Mr. David indicated that DCB seemed depressed at times.  (Tr. 150.)  Mr. David indicated that DCB's medication helped him to be in "better control."  (*Id*.)  He also wrote that DCB "cannot function in a normal classroom setting."  (Tr. 151.)  He wrote, "He is way below grade level.  He is very rough and often hurts other children."  (*Id*.)

On June 3, 2009, one of DCB's special education teachers, Ms. Davis, completed a Teacher Questionnaire for the Social Security Administration.  (Tr. 110-17, 167.)  She indicated that she had taught DCB for three years.  (Tr. 110.)  At that time, Plaintiff was in the fourth grade.  Ms. Davis indicated that his instruction level for reading was 1.4; and his instruction level for math was 2.2. (*Id*.)  With regard to acquiring and using information, Ms. David indicated that Plaintiff had a "serious problem" performing in all aspects of acquiring and using information.  (Tr. 111.)  With regard to attending and completing tasks, Ms. Davis indicated that DCB had an "obvious problem"

10

paying attention when spoken to directly, and a "very serious problem" working at a reasonable pace/finishing on time. (Tr. 112.) Her handwritten notes indicated that DCB had a "hard time staying focus[ed] for a long period of time." (*Id*.) With regard to interacting and relating with others, Ms. Davis indicated that DCB had a "very serious problem" with the following activities: 1) Making and keeping friends; 2) Seeking attention appropriately; 3) Expressing anger appropriately; 4) Following rules; 5) Respecting/obeying adults in authority; 6) Introducing and maintaining relevant and appropriate topics of conversation; 7) Taking turns in conversation; 8) Interpreting body language; and 9) Using adequate vocabulary. (Tr. 113.) She also indicated that she had to implement "behavior modification strategies" for DCB. (*Id*.) She indicated that he had no problems moving about and manipulating objects. (Tr. 114.) With regard to caring for himself, Ms. Davis indicated that DCB had a "very serious problem" with the following activities: 1) Handling frustration appropriately; 2) Being patient when necessary; 3) Cooperating in, or being responsible for, taking needed medications; 4) Using good judgement regarding personal safety and dangerous circumstances; 5) Identifying and appropriately asserting emotional needs; 6) Responding appropriately to changes in own mood (e.g., calming self); 7) Using appropriate coping skills to meet daily demands of school environment; and 8) Knowing when to ask for help. (Tr. 115.)

### C.  Framework for Child Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 1382c(a)(3)(C). The Social Security regulations set forth a sequential three-step process for determining children's disability claims: first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. § 416.924.

To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of the impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment(s) do not "meet" a listed impairment, the impairment(s) may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. § 416.926a. "Medical equivalency is covered by 20 C.F.R. § 416.926; functional equivalency is covered by Section 416.926a." *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003).

"To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, No. 1:08CV254, 2009 WL 1741375, at *8 (S.D. Ohio 2009) (citing 20 C.F.R. § 416.926(a)). A claimant can demonstrate medical equivalence in any of three ways:

12

(1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;

(2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or

(3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Koepp v. Astrue*, No. 10-C-1002, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011) (citing 20 C.F.R. § 404.1526(b)); *see also* 20 C.F.R. § 416.926. "The essence of these subsections is that strict conformity with the Listing Requirements is not necessarily required for a finding of disability. If a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance." *Emeonye v. Astrue*, No. 04-03386, 2008 WL 1990822, at *4 (N.D. Cal. May 5, 2008).

Regarding functional equivalence, there are six "domains" that an ALJ considers: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a. Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one of the six domains or "marked" limitations in two of the six. *See* 20 C.F.R. § 416.926a(d). An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(I). A "marked" limitation results if the child's

13

impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 22, 2007 – the application date.  (Tr. 12.)  At step two, the ALJ found that Plaintiff had the following severe impairments: attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD) and a learning disability.  (*Id*.)  At step three, the ALJ concluded that these impairments did not meet or medically equal any Listing.  (*Id*.)  The ALJ also found that DCB's impairments did not functionally equal any listing because Plaintiff had "less than marked" limitations in the domains of "acquiring and using information" and "attending and completing tasks," "marked" limitations in "interacting and relating with others," and no limitations in the remaining three domains.  (Tr. 15-22.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports an ALJ's decision, this

14

Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

15

**F. Analysis**

*1. The ALJ Provided An Inadequate Meets or Medically Equals Analysis*

Plaintiff first argues that the ALJ's decision is erroneous because he failed to properly consider whether DCB's impairments meet or medically equal Listing 112.11: Attention Deficit Hyperactivity Disorder. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. (Dkt. 13, Pl.'s Mot. Summ. J. at 3.) To meet Listing 112.11, the claimant must have medically documented findings of the following "A" criteria:

> 1. Marked inattention;
> 2. Marked impulsiveness; and
> 3. Marked hyperactivity.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.11. Further, Plaintiff must have a "marked" impairment in at least two of the following "B" criteria:

> 1. Age-appropriate cognitive/communicative function documented by medical findings and including if necessary the results of appropriate standardized psychological tests; or
> 2. Age-appropriate social functioning, documented by history and medical findings; or
> 3. Age-appropriate personal functioning documented by history and medical findings; or
> 4. Maintaining concentration, persistence, or pace.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1, Listings 112.11. Plaintiff asserts that "clear evidence" from DCB's teachers demonstrates that DCB's impairments meet or medically equal Listing 112.11. (Dkt. 13, Pl.'s Mot. Summ. J. at 3.) The Commissioner seems to avoid the "meet or medically equal" analysis of step three, and, instead, argues that "no legitimate evidence was submitted to the ALJ that supports a finding that DCB's impairments *functionally* satisfy the criteria of any listing, including Listing 112.11." (Dkt. 18, Def.'s Mot. Summ. J. at 11 (emphasis added).)

In determining that DCB did not meet or medically equal a listed impairment, the ALJ

16

provided the following brief analysis:

> Although Claimant's impairments are considered "severe" under the regulations, they do not medically meet or medically equal the severity requirements of any listed impairment.  Specifically, the medical record fails to document listing-level severity under 103.3 (Asthma), 112.05 (Mental Retardation), 112.11 (Attention Deficit Hyperactivity Disorder) or 112.08 (Personality Disorders), and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

(Tr. 12.)

As is plain from the quoted passage, the ALJ did not cite, discuss, or resolve any conflicts in the evidence in concluding that DCB's impairment did not meet or medically equal a Listing.

When faced with similarly conclusory meets or medically equals analysis, courts have found that the ALJ's narrative deprives the federal court of its ability to act as an appellate tribunal and instead forces the court to become the finder of fact:

> In this case, the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment. . . .  Such a bare conclusion is beyond meaningful judicial review. Under the Social Security Act,
>
> > [t]he Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter.  Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.
>
> 42 U.S.C. 405(b)(1). Under this statute, the ALJ was required to

17

discuss the evidence and explain why he found that appellant was not disabled at step three.

This statutory requirement fits hand in glove with our standard of review. By congressional design, as well as by administrative due process standards, this court should not properly engage in the task of weighing evidence in cases before the Social Security Administration. Rather, we review the Secretary's decision only to determine whether her factual findings are supported by substantial evidence and whether she applied the correct legal standards.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

The Court acknowledges that the ALJ need not "spell[] out every consideration that went into the step three determination" and that, in some cases, factual findings elsewhere in the narrative may suffice as factual findings at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). But to the extent that the Commissioner would assert that the ALJ's analysis regarding functional equivalence suffices for the required meets and medically equals analysis, there is a plethora of case law to the contrary. *See Alworden ex rel. K.L.A. v. Comm'r of Soc. Sec.*, No. 1:09-cv-1040, 2011 WL 1118611, at *6 (W.D. Mich. Jan. 24, 2011) *adopted by* 2011 WL 1102848 (W.D. Mich. Mar. 25, 2011) ("While the ALJ's decision provides a lengthy discussion of whether plaintiff's condition is functionally equivalent to a listing under 20 C.F.R. § 416.926a, he failed to provide a meaningful discussion of whether plaintiff's condition met the requirements of Listing 112.06 A.3. . . . "); *Veiga ex rel. I.J.M. v. Astrue*, No. 8:07-CV-1001, 2008 WL 4371330, at *10 (M.D. Fla. Sept. 19, 2008) ("[T]he Commissioner cannot rely on the ALJ's detailed discussion of functional equivalence to support the ALJ's findings that Claimant did not meet or medically equal any Listing. The only detailed explanation of the ALJ's findings regarding Claimant's impairments is set out in the ALJ's discussion of the six domains of functional limitations which must be considered in determining functional equivalence. However, the ALJ is required to evaluate and

make separate determinations on whether Claimant's impairments meet, medically equal, or functionally equal the Listing."); *Pena ex rel. Pena v. Barnhart*, No. 01C50455, 2002 WL 31527202, at *13 (N.D. Ill. Nov. 13, 2002) ("Before the ALJ can move onto the six domains of functioning, as he did in his opinion, the ALJ must go through the process to determine whether Plaintiff can or cannot satisfy the listing for ADHD. [The Court] is not suggesting the ALJ's determination, that the severity of Plaintiff's ADHD does not satisfy the requirements in Listing 112.11, is incorrect, but only that greater elaboration is necessary.").

While some authority suggests that remand is justified based on this error alone, *see e.g.*, *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996), this Court acknowledges that it may overlook the ALJ's failure to articulate his step three findings with regard to whether DCB's impairments meet or medically equal Listing 112.11 if the error is harmless in nature. *See Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) ("As a general rule, we have held that an ALJ's failure to adequately explain his factual findings is 'not a sufficient reason for setting aside an administrative finding' where the record supports the overall determination."); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality"); *Reynolds v. Comm'r Soc. Sec.*, No. 09-2060, 2011 WL 1228165 at *3-4 (6th Cir. Apr. 1, 2011) ("[I]n this case, correction of [the ALJ's Step Three failure to articulate] is not merely a formalistic matter of procedure, for it is *possible* that the evidence Reynolds put forth could meet this listing." (emphasis added)). In fact, the Sixth Circuit's decision in *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009), while dealing with a related yet different procedural requirement, is instructive on this issue.

19

In *Rabbers*, the ALJ failed to apply a regulation-mandated "special technique" for evaluating mental impairments at step three. 582 F.3d at 654. In particular, the applicable regulations required the ALJ to, *inter alia*, "'record the presence or absence of the criteria [of the listing] and the rating of the degree of functional limitation.'" *Id.* at 654 (quoting 20 C.F.R. § 404.1420a(d)(2)). Yet the ALJ "neglect[ed] to make specific B criteria findings as required under § 404.1520a(e)(2)." *Id.* at 654. In holding that the ALJ's error could be overlooked as harmless, the Sixth Circuit explained,

> Generally, . . . we review decisions of administrative agencies for harmless error. . . . Accordingly, if an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses."

*Id.* at 654. Regarding the particular procedural error before it, the appellate court reasoned that it was distinct from a violation of the explanatory requirement of the treating physician rule for which courts apply a "circumscribed" harmless error review:

> If an ALJ rejects a treating physician's opinion but gives no reasons for doing so, it is difficult for a reviewing court to conduct its own analysis and make a judgment as to what the ALJ's reasons would have been – unless . . . the treating physician's opinion is "so patently deficient that the Commissioner could not possibly credit it." Faced with an ALJ's failure to address the B criteria, however, a reviewing court need only ask whether the record indicates that the claimant's mental impairment would have ultimately satisfied the B criteria. This kind of evidence – evidence regarding the claimant's activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation – is objective, concrete factual and medical evidence that will be apparent in the record, at least in some cases.

*Id.* at 656-57 (internal citation omitted).

Accordingly, this Court will review the record to determine whether the ALJ's failure to analyze whether DCB's impairments meet or medically equal Listing 112.11 is harmless. In so

20

doing, however, this Court emphasizes that it will not shift from its primary role as a reviewer of fact

nor find an ALJ's error harmless merely because substantial evidence exists in the record that could

uphold the ALJ's decision.  As aptly explained by a court in this Circuit:

> The Commissioner interprets *Rabbers* to require reviewing courts to
> affirm the ALJ's conclusion so long as it is supported by substantial
> evidence. . . . Yet *Rabbers* specifically held that an ALJ's decision
> will be reversed when it prejudices the claimant on the merits, "even
> if supported by substantial evidence."  *Rabbers*, 582 F.3d at 651
> (emphasis added). . . .  [T]o read *Rabbers* as the Commissioner
> proposes would immunize an ALJ's decision from review whenever
> the ALJ *could have* found on the record that the claimant was not
> disabled.  Instead, *Rabbers* holds that an error is harmless only when
> "concrete factual and medical evidence" is "apparent in the record"
> and shows that even if the ALJ had made the required findings, the
> ALJ *would have* found the claimant not disabled. . . .  This is no
> trivial distinction, but goes to the very heart of administrative
> adjudication.  If the reviewing court were permitted to affirm any
> outcome that could have been supported by the evidence, it would
> propel the court into the domain which Congress has set aside
> exclusively for the administrative agency.

*Juarez v. Astrue*, No. 2:09-cv-160, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010) (some

internal citations, quotations, and alterations omitted); *see also Marok v. Astrue*, No. 5:08CV1832,

2010 WL 2294056, at *8-9 (N.D. Ohio June 3, 2010) ("[C]ourts apply a harmless error analysis

cautiously, taking care to avoid rewriting an ALJ's decision *post hoc* even when substantial evidence

exists to support the ALJ's decision.").

    Here, the Court cannot say with confidence that the same disability outcome "would have"

resulted had the ALJ performed a more rigorous meets or medically equals analysis.  Regarding the

"A" criteria of Listing 112.11, there is medical evidence on the record that DCB had problems with

all three criteria: inattention, impulsiveness and hyperactivity.  *See* C.F.R. pt. 404, subpt. P, app.1,

Listing 112.11.

With regard to inattention, at least four different therapists and psychiatrists at Eastwood Clinic noted on multiple occasions that DCB's attention/concentration were poor, and insight and judgment limited.  (Tr. 137, 204.)

Moreover, these same therapists and psychiatrists noted that DCB had problems with impulsive behavior and tantrums.  (Tr. 137, 188.)  Indeed, on an April 5, 2009 Treatment Plan Review Form, a therapist indicated that DCB got into a fight, and had "some impulse problems – touching other students inappropriately."  (Tr. 184.)  The therapist also indicated that DCB was at risk for further impulsive behavior.  (*Id*.)  In addition, on July 11, 2009 another therapist noted DCB's disruptive behavior, and added a diagnosis of impulse control disorder.  (Tr. 224, 226.)

Lastly, there is medical evidence on the record the DCB had problems with hyperactivity. Most obviously, the therapists and psychiatrists at Eastwood diagnosed DCB with ADHD repeatedly.  (Tr. 129-39, 221-28.)  Indeed, Therapist Verbeke wrote that DCB's "behavior is extremely hyper in all settings.  He throws temper tantrums, argues with adults, refuses to comply with reasonable adult requests, is easily annoyed by others (abusive at intake) and is often angry." (Tr. 138.)  Psychiatrist Wailes confirmed this assessment.  (*Id*.)  In addition, Psychiatrist Wailes prescribed three different medications during her treatment of DCB in an attempt to control his hyperactivity.  (Tr. 135, 133, 134, 131.)  The ALJ did not discuss any of this evidence in his meet or medically equals analysis.

Regarding the "B" criteria of Listing 112.11, there is medical evidence on the record that DCB had problems with at least three of the criteria.  *See* C.F.R. pt. 404, subpt. P, app.1, Listing 112.11.  Specifically, the record contains documented medical findings regarding problems with age-appropriate cognitive/communicative functioning and age-appropriate social functioning.  (Tr.

22

141, 138, 188-89.)  Moreover, the record contains documented educational evidence of problems with maintaining concentration, persistence, or pace.  (Tr. 110-17, 141-51, 158-79.)

With regard to cognitive/communicative functioning, although there is significant evidence from DCB's teachers of a marked impairment in age appropriate cognitive/communicative function (Tr. 110-17, 144-51, 158-79), the record does not reveal the necessary *medical findings* by DCB's therapists and psychiatrists regarding cognitive function.  (Tr. 129-39, 221-28.)  However, DDS evidence from Dr. Atul C. Shah, indicates at eight years old, DCB was only "able to recite the alphabet correctly on the third try."  (Tr. 141.) The ALJ did not acknowledge this persuasive evidence of cognitive delay on his review.

There is also both historical and medical findings of a marked impairment in age-appropriate social functioning.   Indeed, as stated previously, on December 28, 2006, when DCB was seven years old, Therapist Verbeke wrote that DCB's "behavior is extremely hyper in all settings.  He throws temper tantrums, argues with adults, refuses to comply with reasonable adult requests, is easily annoyed by others (abusive at intake) and is often angry." (Tr. 138.)  In addition, the record is replete with evidence of DCB repeatedly getting into fights at school, and throwing temper tantrums beyond his preschool years. (Tr. 188-189.)

Lastly, there is a multitude of evidence from DCB's teachers regarding marked difficulties in maintaining concentration, persistence or pace.  The Listings provide that the "intent" of this element is:

> [T]o identify the child who cannot adequately function in primary school because of a mental impairment.  Although grades and the need for special education placement are relevant factors which must be considered in reaching a decision . . . they are not conclusive. There is too much variability from school district to school district in the expected level of grading and in the criteria for special education

placement to justify reliance solely on these factors.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.00(C)(3).

In June of 2007, Mr. David's Teacher Questionnaire for the Social Security Administration indicated that DCB, then a second-grader, was not able to read or write.  (*Id.*)  He performed math at the first grade level.  (*Id.*)  Mr. David also indicated that DCB had a "very serious problem" reading and comprehending written material, and  a "serious problem" expressing ideas in written form.  (*Id.*)  Mr. David further indicated that DCB had a "very serious problem" with focusing long enough to finish an assigned activity or task and carrying out multi-step instructions.  He also wrote that DCB "cannot work independently.  He requires a lot of one on one."  (*Id.*)  He indicated that DCB had a "serious problem" completing work accurately without careless mistakes, working without distracting self or others, and working at a reasonable pace/finishing on time.  (*Id.*)  He also wrote that DCB "cannot function in a normal classroom setting.  He is way below grade level."  (Tr. 151.)

Two year's later, DCB's special education teacher, Ms. Davis, provided a similar analysis of DCB's limitations.  Ms. Davis indicated  DCB's poor instruction levels, that he had an "obvious problem" paying attention when spoken to directly,  a "very serious problem" working at a reasonable pace/finishing on time, and a "hard time staying focus[ed] for a long period of time." (Tr. 110-17, 167)

The ALJ did not discuss any of this evidence in his meet or medically equals analysis.

Lastly, the ALJ did not discuss whether DCB had any analogous or similar impairments that might support a finding of medical equivalence.  Indeed, the ALJ provided no discussion how, if at all, the severe impairments of ODD and a learning disorder impacted his meet or medically equals

24

analysis. Moreover, he did not discuss the record evidence of an impulse control disorder. (Tr. 223-26.)

In short, when the record of this child's history is considered as a whole – including the reports of the psychiatrists, therapists and teachers who interacted with him for significant periods of time – the Court cannot say with confidence that the same disability outcome "would have" resulted had the ALJ performed a more rigorous meets or medically equals analysis.

### 2. Plaintiff Has Not Established That the ALJ's Functional Equivalence Findings Are Not Supported By Substantial Evidence

Unlike the meet or medically equal analysis, the ALJ's narrative does provide reasoning for his functional equivalence determination and makes findings of fact in each of the six domains. (Tr. 12-23.) Plaintiff asserts, however, that substantial evidence does not support the ALJ's conclusions regarding DCB's difficulties with regard to "attending and completing tasks," "interacting and relating to others," and "caring for himself." (Dkt. 15, Pl.'s Mot. Summ. J. at 3-4.) The ALJ found DCB had "less than marked" limitations in attending and completing tasks (Tr. 17), "marked" limitations in interacting and relating to others (Tr. 18) and no limitations in caring for himself or herself (Tr. 21).

In relevant part, the regulations provide the following examples of behaviors that are indicative of impairments in the attending and completing tasks domain:

> (i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.

> (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.

> (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

25

(iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. § 416.926a(h)(3).

To establish that substantial evidence does not support the ALJ's determination that DCB had "less than marked" limitations in the attending and completing tasks domain, Plaintiff points to the teacher questionnaires completed by Mr. David and Ms. Davis. (Dkt. 15, Pl.'s Mot. Summ. J. at 3.) In this particular domain, Mr. David indicated that DCB had a "very serious problem" with focusing long enough to finish an assigned activity or task and carrying out multi-step instructions. (Tr. 146.) He indicated that he had a "serious problem" completing work accurately without careless mistakes, working without distracting self or others, and working at a reasonable pace/finishing on time. (*Id.*) Likewise, Ms. Davis indicated that DCB had an "obvious problem" paying attention when spoken to directly, and a "very serious problem" working at a reasonable pace/finishing on time. (Tr. 112.) Her handwritten notes indicated that DCB had a "hard time staying focus[ed] for a long period of time." (*Id.*) The ALJ acknowledged these questionnaires in his analysis, along with other educational reports and psychiatric evaluations. (Tr. 17.) However, the ALJ chose to give more weight to a psychiatric consultive examination performed by Dr. Shuh on May 11, 2007. (Tr. 17.)

Plaintiff argues that the ALJ did not follow the treating physician rule when he gave more weight to this consultive examination as opposed to DCBs teachers. (Dkt. 15, Pl.'s Mot. Summ. J. at 6.) The "treating physician" rule, however, does not apply to evidence supplied by *teachers*. 20 C.F.R. §§ 404.1527; 416.927. But it does apply to evidence supplied by treating psychologists and psychiatrists. *Id*. With regard to this evidence, the ALJ stated that: "the medical evidence as well

26

as the third party reports, substantiates the State agency's consultant's findings." (Tr. 14.) The ALJ came to this conclusion by focusing on the fact that all the physicians and teachers were in agreement that DCB's ability to attend to and complete tasks improved with medication. (Tr. 18.) While close, the Court cannot find that substantial evidence does not support the ALJ's determination regarding attending and completing tasks.[6]

In relevant part, the regulations provide the following examples of behaviors that are indicative of limitations with regard to interacting and relating to others:

> (i) You do not reach out to be picked up and held by your caregiver.
>
> (ii) You have no close friends, or your friends are all older or younger than you.
>
> (iii) You avoid or withdraw from people you know, or are overly anxious or fearful of meeting new people or trying new experiences.
>
> (iv) You have difficulty playing games or sports with rules.
>
> (v) You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.
>
> (vi) You have difficulty speaking intelligibly or with adequate fluency.

20 C.F.R. § 416.26a(g)(3).

To establish that substantial evidence does not support the ALJ's determination that DCB had "marked" limitations in the interacting and relating to others domain, Plaintiff again points to the teacher questionnaires completed by Mr. David and Ms. Davis. (Dkt. 15, Pl.'s Mot. Summ. J.

---

[6] While this Court would benefit from a more detailed explanation by the ALJ of why he chose to rely on a one-time evaluation by a DDS psychiatrist rather than the other therapists and teachers, it is not the function of the Court to determine how it may have ruled in the first instance.

at 3.)   In this particular domain, Mr. David indicated that DCB had a "very serious problem" expressing anger appropriately. (Tr. 147.) He had "serious problems" with the following activities: 1) Playing cooperatively with other children; 2) Making and keeping friends; 3) Seeking attention appropriately; 4) Following rules; 5) Respecting/obeying adults in authority; 6) using language appropriate to the situation and listener; 7) Taking turns in conversation; 8) Interpreting body language; and 9) Using adequate vocabulary. (*Id*.)  Ms. Davis likewise indicated that DCB had a "very serious problem" with the following activities: 1) Making and keeping friends; 2) Seeking attention appropriately; 3) Expressing anger appropriately; 4) Following rules; 5) Respecting/obeying adults in authority; 6) Introducing and maintaining relevant and appropriate topics of conversation; 7) Taking turns in conversation; 8) Interpreting body language; and 9) Using adequate vocabulary.   (Tr. 113.)   She also indicated that she had to implement "behavior modification strategies" for DCB.  (*Id*.) The ALJ acknowledged these questionnaires in his analysis, along with other educational reports and psychiatric evaluations, and concluded that "Claimant's impairments interfere seriously with his ability to interact and relate with others and he therefore has a marked limitation in this domain of functioning." (Tr. 19-20.) Substantial evidence supports this determination.   Indeed, the Court believes that substantial evidence would also support the determination of an extreme limitation in this domain of functioning.  However, as indicated above, if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted). Therefore, this Court affirms this finding.

In relevant part, the regulations provide the following examples of behaviors that are

28

indicative of limitations with regard to caring for oneself:

> (i) You continue to place non-nutritive or inedible objects in your mouth.
>
> (ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
>
> (iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.
>
> (iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.
>
> (v) You do not spontaneously pursue enjoyable activities or interests.
>
> (vi) You have disturbance in eating or sleeping patterns.

20 C.F.R. § 416.926a(k)(3).

To establish that substantial evidence does not support the ALJ's determination that DCB had "no" limitations in the caring for oneself domain, Plaintiff again points to the teacher questionnaires completed by Mr. David and Ms. Davis. (Dkt. 15, Pl.'s Mot. Summ. J. at 3.) However, in this particular domain the teacher questionnaire focuses on activities such as: 1) Handling frustration appropriately; 2) Using good judgment regarding personal safety and dangerous circumstances; 3) Identifying and appropriately asserting emotional needs; 4) Responding appropriately to changes in own mood; 5) Being patient when necessary; 6) Cooperating in, or being responsible for, taking needed medications; 7) Using good judgement regarding personal safety and dangerous circumstances; 8) Identifying and appropriately asserting emotional needs; 9) Responding appropriately to changes in own mood (e.g., calming self); 10) Using appropriate coping skills to meet daily demands of school environment; and 11) Knowing when to ask for help. (Tr. 115, 149.)

As such, the teacher questionnaire is not relevant to the specific examples set out by the regulations. Of more relevance is the Plaintiff's own evidence regarding Plaintiff's daily activities that indicated that DCB cared for himself appropriately. (Tr. 94-96.) The ALJ acknowledged this evidence in his brief analysis of this domain. (Tr. 21.) Notably, at the time of the ALJ's decision, the ALJ did not have the opportunity to consider DCB's visit to the emergency room in 2010. As, such substantial evidence supports his finding on this domain.

### G. Conclusion

For the foregoing reasons, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED. On remand, the ALJ shall make factual findings pertaining to whether DCB's impairments meet or medically equal the criteria within Listing 112.11. Moreover, this Court recommends that, upon remand, the ALJ may consider the additional evidence submitted to the Appeals Council pertaining to DCB's impairments. *See Faucher v. Secretary of Health and Human Servs.*, 17 F.3d 171, 175 (6th Cir. 1994) (holding that a court may order the review of additional evidence on a sentence four remand). Although this Court does not recommend requiring the ALJ to revisit his functional equivalence analysis, to the extent that the ALJ's more thorough analysis of the record leads to factual findings that would materially affect the existing functional equivalence analysis, the ALJ should alter that analysis accordingly. *See Sorenson v. Astrue*, No.10-C-0582, 2011 WL 1043362, at *9-11 (E.D. Wis. Mar. 18, 2011).

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation

within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: March 21, 2012


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 21, 2012.


s/Jane Johnson
Deputy Clerk

31